People v Lloyd F. (2025 NY Slip Op 04583)

People v Lloyd F.

2025 NY Slip Op 04583

Decided on August 6, 2025

Appellate Division, Second Department

Chambers, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on August 6, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

LARA J. GENOVESI, J.P.
CHERYL E. CHAMBERS
CARL J. LANDICINO
PHILLIP HOM, JJ.

2022-03746
 (Ind. No. 70092/20)

[*1]The People of the State of New York, respondent,
v
Lloyd F. (Anonymous), appellant.

APPEAL by the defendant from a judgment of the Supreme Court (Alison M. Hamanjian, J.), rendered April 29, 2022, and entered in Richmond County, convicting him of attempted criminal possession of a weapon in the second degree, upon his plea of guilty, and imposing sentence. The appeal brings up for review an order of the same court dated May 10, 2021, granting the People's motion pursuant to CPL 722.23(1) to prevent removal of this action to the Family Court, Richmond County, and the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress physical evidence. Justice Hom has been substituted for former Justice Maltese (see 22 NYCRR 1250.1[b]).

Patricia Pazner, New York, NY (Steven C. Kuza of counsel), for appellant.
Michael E. McMahon, District Attorney, Staten Island, NY (Rhys Johnson and Thomas B. Litsky of counsel), for respondent.

CHAMBERS, J.

OPINION & ORDER
The case at bar concerns a 16-year-old defendant who was charged with weapon possession offenses. The defendant contends that the Youth Part of the Supreme Court, Richmond County, abused its discretion as a matter of law when it granted the People's motion pursuant to CPL 722.23(1) to prevent removal of this action to Family Court (see id. § 722.23[1][d]). In reviewing the defendant's contention, this Court is called upon to interpret the meaning of "extraordinary circumstances" as the phrase is used in subdivision (1)(d) of CPL 722.23. For the reasons that follow, we conclude that, under any reasonable interpretation of the phrase "extraordinary circumstances," the record does not support a determination that such circumstances exist to prevent removal of this case to Family Court.[FN1]
I. Statutory framework of CPL 722.23
In 2017, the New York State Legislature enacted legislation known as "Raise the Age," which, among its provisions, expressly created a specialized Youth Part in the Superior or Supreme Court of each county (see L 2017, ch 59, Part WWW, § 1-a, codified at CPL art 722 [*2][hereinafter the Raise the Age legislation]; see also Matter of County of Nassau v Nassau County Sheriff's Corr. Officers Benevolent Assn., Inc., 213 AD3d 661, 661-662). The Youth Part is authorized to determine the proper forum for prosecution of "adolescent offenders"—defendants who are charged with felonies committed when they were 16 or 17 years of age (see CPL 1.20[44]; 722.10[1]). The statute creates a presumption of removal to Family Court for adolescent offenders, subject to listed exceptions (see id. § 722.23[1][a]; [2][a], [c]; People v K.S., 84 Misc 3d 319, 324 [Sup Ct, Richmond County]; People v A.M., 82 Misc 3d 1249[A], 2024 NY Slip Op 50582[U] [Putnam County Ct]). The listed exceptions apply where the defendant has been charged with a class A non-drug felony or a violent felony and the district attorney has "proved by a preponderance of the evidence," at a court appearance to be held within six days of arraignment, that "as set forth in the accusatory instrument" the defendant either (1) "caused significant physical injury" during the commission of the offense, (2) "displayed a firearm, shotgun, rifle or deadly weapon" in "furtherance of" the offense, or (3) committed a sex offense (CPL 722.23; see People v Guerrero, 235 AD3d 1276, 1277; Clark v Boyle, 210 AD3d 463, 464). Unless the Youth Part determines in writing that the district attorney has made such a showing, the Youth Part "shall order the action to proceed" in accordance with the procedures set forth in CPL 722.23(1)(a) for removal to Family Court (id. § 722.23[2][c]).
CPL 722.23(1)(a) provides that, when an action is eligible for removal to Family Court, the Youth Part "shall" order the action removed "unless" the People make a timely motion to prevent removal. The statute further provides that the motion "shall" be denied, unless the Youth Part makes a determination that "extraordinary circumstances exist that should prevent the transfer of the action to family court" (id. § 722.23[1][d]). The Youth Part's determination shall include "findings of fact and to the extent practicable conclusions of law" (id. § 722.23[1][e]).
The consequence of removal to Family Court is that the criminal action is terminated (see CPL 725.10), and the Family Court assumes exclusive jurisdiction pursuant to Article 3 of the Family Court Act to determine whether the adolescent is a juvenile delinquent (see Family Ct Act §§ 301.2, 302.1). This statutory framework removes certain cases from the adult criminal justice system, thereby avoiding the entry of a criminal conviction, and reflects the Legislature's determination that such matters are more appropriately addressed in a rehabilitative forum (see Green v Montgomery, 95 NY2d 695, 698; see also Family Ct Act §§ 301.1; 352.2).
II. Statutory interpretation
The phrase "extraordinary circumstances" is not defined in the Raise the Age legislation (id. § 722.23[1][d]). "In the absence of a statutory definition," the Court of Appeals instructs that "words of ordinary import" must be construed "with their usual and commonly understood meaning," and that "dictionary definitions" may serve as "useful guideposts in determining the meaning of a word or phrase" (Nadkos, Inc. v Preferred Contrs. Ins. Co. Risk Retention Group LLC, 34 NY3d 1, 7 [internal quotation marks omitted]; see People v Andujar, 30 NY3d 160, 163). "'[T]he legislative history of an enactment may also be relevant and is not to be ignored, even if words be clear'" (People v Badji, 36 NY3d 393, 399, quoting Riley v County of Broome, 95 NY2d 455, 463). "In a manner consistent with the text, we may look to the purpose of the enactment and the objectives of the legislature" (Lubonty v U.S. Bank N.A., 34 NY3d 250, 255; see Bank of Am., N.A. v Kessler, 39 NY3d 317, 324). Our interpretation of the statutory phrase "extraordinary circumstances" therefore is guided by its common, ordinary usage, as reflected in dictionary definitions, and by the history and context of the Raise the Age legislation (see People v Guerrero, 235 AD3d 1276, 1280-1281; People v T.P., 73 Misc 3d 1215[A], 2021 NY Slip Op 51048[U] [Nassau County Ct]).
The Legislature's intent, as reflected in the language of the Raise the Age legislation, is clear and inescapable. Merriam-Webster defines "extraordinary" as "beyond what is usual, regular, or customary" or "exceptional to a very marked extent" (Merriam-Webster.com Dictionary, extraordinary [https://www.merriam-webster.com/dictionary/extraordinary]). Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common" (Black's Law Dictionary [12th ed 2024], extraordinary).
Further, the impetus for the passage of the Raise the Age legislation bolsters our conclusion that extraordinary circumstances should only be found in the most exceptional cases. For at least the past two decades, the United States Supreme Court has recognized "[t]hree general differences between juveniles under 18 and adults" that are relevant to the manner in which the [*3]criminal justice system treats juvenile defendants (Roper v Simmons, 543 US 551, 569). First, the Court has recognized that "'a lack of maturity and an underdeveloped sense of responsibility . . . often result in impetuous and ill-considered actions and decisions'" (id. [alteration omitted], quoting Johnson v Texas, 509 US 350, 367). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," a vulnerability explained in part "by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment" (id.), often "lack[ing] the freedom that adults have to extricate themselves from a criminogenic setting" (id., quoting Laurence Steinberg & Elizabeth S. Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am Psych 1009, 1014 [2003]). Third, "the character of a juvenile is not as well formed as that of an adult," and the "personality traits of juveniles are more transitory, less fixed" (id. at 570). As a result of these fundamental differences, the Court concluded that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed" (id.).
Since Roper, the United States Supreme Court has continued to acknowledge that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds" (Graham v Florida, 560 US 48, 68). "For example, parts of the brain involved in behavior control continue to mature through late adolescence" (id., citing brief for American Medical Association et al., available at 2009 WL 2247127, *16-24, and brief for American Psychological Association et al., available at 2009 WL 223778, *22-27).
In line with this evolving understanding, New York took steps to reform its approach to youth in the justice system. In April 2014, then-Governor Andrew Cuomo issued Executive Order 131, establishing the Commission on Youth, Public Safety, and Justice (hereinafter the Commission), to provide recommendations to the Governor pertaining to youth in New York's justice systems (see Executive Order [A. Cuomo] No. 131 [9 NYCRR 8.131]). The Executive Order acknowledged that although New York had been a national leader in youth justice reform, it remained "one of only two states that continue[d] to prosecute 16- and 17-year-olds through the adult criminal justice system, the vast majority of whom are youth of color" (id.). It further highlighted the risks associated with incarcerating youth alongside adults, noting that "youth incarcerated with adults are less likely to receive the services they need to succeed and are at increased risk of violent or sexual assault, mental health issues, and suicide" (id.). The Executive Order also cited analysis by the U.S. Centers for Disease Control and Prevention, which found that "the felony recidivism rate in one state was 34 percent higher for youth whose cases were handled in adult court compared to youth whose cases were handled outside of adult court" (id.). In addition, the Executive Order emphasized that "leading brain research indicates that the cognitive skills of youth are not fully developed, rendering them more susceptible to peer pressure, less capable of mature judgment and consequential thinking, though highly responsive to interventions" (id.).
Executive Order No. 131(B)(1) directed the Commission to "(a) develop a plan to raise the age of juvenile jurisdiction, and (b) make other recommendations as to how New York's justice systems can improve outcomes for youth while promoting community safety." In doing so, the Commission was instructed to "ensure that protecting communities and preventing victimization remain[ ] the top priority" (id.). The Commission was directed to make recommendations "to better serve youth, improve outcomes, protect communities, prevent victimization, address harm reduction among the small percentage of youth who repeatedly commit serious violent crime, and ensure New York's place as a national leader in addressing youth justice and public safety" (Executive Order No. 131[B][1][c]). Thereafter, the Commission issued a detailed report setting forth its recommendations for reform (see Final Report of the Governor's Commission on Youth, Public Safety, and Justice, Recommendations for Juvenile Justice Reform in New York State, available at https://www.governor.ny.gov/sites/default/files/atoms/files/ReportofCommissiononYouthPublicSafetyandJustice_0.pdf [last accessed July 15, 2025]).
The Raise the Age legislation was ultimately enacted by the Legislature in 2017 as part of a broader omnibus bill that addressed multiple issues (see L 2017, ch 59, Part WWW, § 1-a). During the Assembly floor debate, Assembly Member Joseph Lentol, one of the bill's drafters, described the final version as a "compromise" facilitated by the Governor (NY Assembly, Transcript, Apr. 8, 2017 at 21 [hereinafter Assembly tr]). Under this compromise, "only those cases [involving] truly violent felons would stay in the criminal part, and those kids who were not violent would be able to find their way to the family court where they not only could get superior services, but would [*4]be able to get better outcomes for their lives" (id.). Assembly Member Lentol explained that, while all felony cases involving adolescent offenders would initially "start in the adult criminal court," the legislative intent was for the "overwhelming bulk of the cases" to be "promptly transferred from the adult court to the family court" (id. at 37). Only "extremely rare and exceptional cases" would remain in the Youth Part of criminal court (id. at 38). He further emphasized that "[t]ransfer to the family court should be denied only when highly unusual and heinous facts are proven and there is a strong proof that the young person is not amenable or would not benefit in any way from the heightened services in the family court" (id. at 39).
During the debate, legislators provided illustrative examples of what might constitute "extraordinary circumstances" warranting retention in the Youth Part. These examples included "proof of a series of serious crimes committed by the [adolescent offender] over the course of many days," that the adolescent offender acted "in an especially cruel and heinous manner," or that the adolescent offender was "a ringleader who threatened and coerced reluctant youths to participate in the crimes" (id. at 40). It was further contemplated that such aggravating factors would be balanced against mitigating considerations, "such as economic difficulties, substandard housing, poverty, learning difficulties, of course, and educational challenges, lack of insight and susceptibility to peer pressure due to immaturity, absence of positive role models, behavioral role models, abuse of alcohol or controlled substances by the [adolescent offender], by family or by peers" (id.).
As noted by Assembly Member Helene Weinstein during the floor debate, the phrase "extraordinary circumstances" appears in other areas of New York law (id. at 38). For example, it is used in determining whether a noncustodial parent may be denied parental access with his or her child (see Matter of Morales v Diaz, 233 AD3d 1033; Matter of Kerry D. v Deena D., 230 AD3d 492, 494) or whether a nonparent may obtain custody over a parent (see Matter of Suarez v Williams, 26 NY3d 440, 446). While these contexts are markedly different from the juvenile justice framework, they nonetheless underscore a shared legislative intent that the phrase "extraordinary circumstances" be understood to signify a very high threshold, applicable only in the most uncommon of cases. Simply put, we interpret the Legislature's deliberate use of the phrase "extraordinary circumstances" in the Raise the Age legislation as reflecting a clear policy choice—that adolescent offenders should be prosecuted in criminal court only in the most exceptional cases.
The above legislative history reflects that the Raise the Age legislation was driven by several core objectives: (1) to modernize New York law to be in line with contemporary scientific research and with the practices of other states; (2) to reduce the disproportionate impact of the criminal justice system upon adolescents of color; (3) to mitigate the lifelong consequences that can result from mistakes attributable to adolescent immaturity; and (4) to expand access to supportive services that promote positive outcomes for youth (see Graham v Florida, 560 US at 68-69; Roper v Simmons, 543 US at 569-570; Executive Order 131; Assembly tr at 38-40).
These policy goals, in turn, provide an analytic framework for determining whether extraordinary circumstances justify retaining a case in the Youth Part, rather than removing it to Family Court. While each case must be assessed on its own unique facts and circumstances, we begin with the presumptions—clearly intended by the Legislature—that the vast majority of adolescent offender cases should be removed to Family Court and that only the most exceptional cases should be retained in the Youth Part of the adult criminal court. To determine whether a case qualifies as exceptional, we look for aggravating factors that demonstrate a degree of cruelty, heinousness, or recidivism suggesting that an adolescent offender's conduct is not simply the result of youthful impulsivity or an inability to control their environment (see Assembly tr at 39-40; cf. Roper v Simmons, 543 US at 569-570). Our balancing of aggravating factors and mitigating factors is guided by an overarching consideration: whether the "possibility exists that [the adolescent offender's] deficiencies will be reformed" (Roper v Simmons, 543 US at 570), or, conversely, whether there is "strong proof that the young person is not amenable or would not benefit in any way from the heightened services in the family court" (Assembly tr at 39).
III. Application to the case at bar
With this legal and policy framework in mind, we turn to the determination made by the Youth Part in the instant matter. The defendant was charged with criminal possession of a weapon in the second degree, criminal possession of a firearm, and criminal possession of a weapon in the fourth degree for acts he committed when he was 16 years old. Pursuant to CPL 722.23(2)(c), the Youth Part held a hearing within six days of the defendant's arraignment to determine whether [*5]the People had proven, by a preponderance of the evidence, that the allegations in the accusatory instrument were sufficient to retain the case in the Youth Part. The felony complaint alleged that the defendant possessed a loaded .40 caliber pistol outside of his home or business, with 1 round in the chamber and 15 rounds in an attached magazine.
At the hearing, defense counsel argued that the defendant had not displayed the firearm in furtherance of the offense within the meaning of CPL 722.23(2)(c)(ii). The People did not argue otherwise and did not seek retention under CPL 722.23(2)(c). Instead, the People advised the Youth Part that they intended to file a motion pursuant to CPL 722.23(1)(b) to prevent removal based on extraordinary circumstances. In their written motion, the People conceded that the defendant "does not fit the three prongs enumerated [in CPL 722.23(2)(c)] for retention of cases for violent felonies, making this defendant legally eligible for removal to Family Court," but argued that "extraordinary circumstances exist that require that this case remain in the jurisdiction" of the Youth Part pursuant to CPL 722.23(1)(b).
In support of their motion, the People relied on the felony complaint and a four-page affirmation submitted by the assistant district attorney (hereinafter the ADA). The ADA's affirmation asserted that, at an unspecified time prior to the defendant's arrest, a police officer observed a social media livestream in which the defendant allegedly was smoking marijuana and pointing a firearm at the camera. The affirmation further noted that the defendant had a prior youthful offender adjudication for assault in the first degree, for which he was sentenced to a term of imprisonment of one year.
In an order dated May 10, 2021 (hereinafter the May 2021 order), the Youth Part granted the People's motion pursuant to CPL 722.23(1)(b) to prevent removal of this action to Family Court. In an order dated March 21, 2022, the Youth Part, after a hearing, denied that branch of the defendant's omnibus motion which was to suppress physical evidence. Thereafter, the defendant entered a plea of guilty to attempted criminal possession of a weapon in the second degree in full satisfaction of the indictment.
We conclude that the Youth Part abused its discretion in granting the People's motion, as the facts presented to the Youth Part do not "reasonably support" (People v Cook, 34 NY3d at 423 [internal quotation marks omitted]) a finding that the action involves "extraordinary circumstances" that warrant retention of this matter in the Youth Part rather than transfer to Family Court (see CPL 722.23[1][d]).
First, we consider whether the charged offenses alone meet the extraordinary circumstances standard. In evaluating this question, we examine whether the facts alleged, without more, rise to the level of exceptionality contemplated by the Raise the Age legislation. To make such a showing, the People must identify conduct that falls outside of the range of behavior that the Legislature presumed would be more appropriately addressed in Family Court. Here, the defendant's possession of a loaded weapon, in a high crime area, at 16 years old, standing alone, does not amount to "extraordinary circumstances." The Legislature did not designate weapon possession offenses categorically ineligible for removal. Instead, it limited ineligibility to cases in which the People prove, by a preponderance of the evidence, that the adolescent "displayed a firearm" or "deadly weapon" in furtherance of an offense (id. § 722.23[2][c][ii]). The deliberate narrowing makes clear that the Legislature contemplated that certain weapon possession offenses where no weapon was displayed or used in furtherance of another offense could appropriately be transferred to Family Court. Consistent with this interpretation, trial-level courts have denied motions to prevent removal to Family Court in similar actions where no one was physically harmed, no property was damaged, and the firearm was not used in furtherance of another crime (see e.g. People v W.C., 85 Misc 3d 1225[A], 2025 NY Slip Op 50276[U] [Fam Ct, Erie County]; People v J.R., 83 Misc 3d 1286[A], 2024 NY Slip Op 51223[U] [Sup Ct, Schenectady County]).
We next consider whether the additional evidence submitted by the People supports a finding of extraordinary circumstances. Assuming without deciding that the ADA's unsourced affirmation was properly before the Supreme Court, its contents do not support a finding of extraordinary circumstances. As previously noted, the ADA alleged that a police officer observed a social media livestream, which was broadcast at an unspecified time prior to the defendant's arrest, in which the defendant appeared to smoke marijuana and point a firearm at the camera. There was no allegation that the defendant engaged in any unlawful conduct beyond possessing the firearm or that the defendant intended to use the firearm to commit or further another crime at the time of his arrest. Moreover, it is undisputed that no one was harmed (cf. People v Guerrero, 235 AD3d at [*6]1276; People v B.H., 83 Misc 3d 1286[A], 2024 NY Slip Op 51224 [U] [Fam Ct, Erie County]).
The defendant's alleged behavior exhibited the very characteristics of adolescent decision-making, according to the United States Supreme Court, that warrant the sensitive treatment of youth in the justice system—"impetuous and ill-considered actions and decisions" resulting from "a lack of maturity and an underdeveloped sense of responsibility," heightened susceptibility to "negative influences and outside pressures, including peer pressure" (Roper v Simmons, 543 US at 569 [alteration and internal quotation marks omitted]), and a limited control over their immediate environment and inability to "extricate themselves from a criminogenic setting" (id., quoting Laurence Steinberg & Elizabeth S. Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penality, 58 Am Psych at 1014).
Further, the May 2021 order, granting the People's motion pursuant to CPL 722.23(1) to prevent removal of this action to Family Court, appears to conclude that the weapon possession offense itself was not extraordinary. Instead, the Youth Part relied, in part, on the defendant's "criminal background and failure to benefit from services previously offered," which it deemed "significant aggravating factors," to conclude that extraordinary circumstances existed. But the record does not support that conclusion. It reflects no pattern of recidivism or escalating conduct (cf. People v J.K., 78 Misc 3d 1221[A], 2023 NY Slip Op 50312[U] [Fam Ct, Erie County]). As discussed above, the only criminal history referenced in the People's motion was a youthful offender adjudication for a group assault committed when the defendant was 14 years old, in which he was not a primary actor, and for which he received a term of imprisonment of one year. This limited criminal history does not establish that the defendant "is not amenable or would not benefit in any way from the heightened services in the family court" (Assembly tr at 39).
To the contrary, the record shows that the defendant engaged meaningfully with Family Court services. As the Youth Part acknowledged, materials submitted in opposition to the People's motion demonstrated that, while incarcerated, the defendant formed a relationship with a pastor "who provided him with mentorship and guidance while incarcerated." The pastor described the defendant as "very young" and "very immature" but "never disrespectful," and explained that through pastoral counseling, the defendant "slowly bec[a]me self-aware" of challenges within his family. Upon release, the defendant reconnected with the pastor, enrolled in "several programs," received transportation to appointments, and was introduced to a local Councilperson who offered employment assistance. Yet the Youth Part cited this very progress as a basis to prevent removal to Family Court, concluding that "[d]espite all of these interventions, the [d]efendant was rearrested for possessing a loaded firearm," and, therefore, it was "difficult for the Court to determine that the [d]efendant would be amenable to any additional services offered through the Family Court."
In effect, the Youth Part treated a single rearrest—absent a conviction—as dispositive of the defendant's future potential. That reasoning, if broadly applied, would undermine the core purpose of the Raise the Age legislation. The mere fact that an adolescent engaged in rehabilitative services and was later arrested, without more, does not constitute "strong proof" (Assembly tr at 39) that he or she is beyond the reach of the Family Court system.
Although the Youth Part concluded that "no one factor on its own may have been enough," it found that the defendant's prior record and prior service engagement, "coupled" with the "nature of the pending charges," amounted to extraordinary circumstances. But none of those factors, either individually or together, rise to the level of exceptionality contemplated by the Raise the Age legislation. A second arrest for a victimless act of adolescent bravado does not convert otherwise ordinary circumstances into extraordinary ones.
Therefore, the Youth Part should have denied the People's motion pursuant to CPL 722.23(1) to prevent removal of this action to Family Court and transferred this action to the Family Court, Richmond County.
In light of our determination, we need not reach the defendant's remaining contentions that the Youth Part erred in failing to suppress the gun recovered from his bag and that the sentence imposed was excessive.
Accordingly, the judgment is reversed, on the law, the People's motion pursuant to CPL 722.23(1) to prevent removal of this action to the Family Court, Richmond County, is denied, the order dated May 10, 2021, is modified accordingly, and the matter is remitted to the Supreme Court, Richmond County, for the entry of an order removing this action to the Family Court, Richmond County.
GENOVESI, J.P., LANDICINO and HOM, JJ., concur.
ORDERED that the judgment is reversed, on the law, the People's motion pursuant to CPL 722.23(1) to prevent removal of this action to the Family Court, Richmond County, is denied, the order dated May 10, 2021, is modified accordingly, and the matter is remitted to the Supreme Court, Richmond County, for the entry of an order removing the action to the Family Court, Richmond County.
ENTER:
Darrell M. Joseph
Clerk of the Court

Footnotes

Footnote 1:As the defendant limits his contention to arguing that the Supreme Court "abused" its discretion as a matter of law in granting the People's motion pursuant to CPL 722.23(1) to prevent removal of this action to Family Court, and does not argue that the court improvidently exercised its discretion, we apply the abuse of discretion standard of review (see generally People v Cook, 34 NY3d 412, 423; Forman v Henkin, 30 NY3d 656, 662 n 3).